FILED
United States Court of Appeals
Tenth Circuit

October 30, 2009

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DAVID JOE EPPERSON,

      Petitioner - Appellant,

v.

MIKE MULLIN, Warden,

      Respondent - Appellee.

No. 08-5152

N.D. Oklahoma

(D.C. No. 4:04-CV-00550-CVE-PJC)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **BALDOCK**, and **HARTZ**, Circuit Judges.

---

David Joe Epperson (Defendant) was convicted in Oklahoma state court of

child abuse and sentenced to life in prison. The Oklahoma Court of Criminal

Appeals (OCCA) affirmed his conviction and sentence on direct appeal. He then

filed an application for habeas relief under 28 U.S.C. § 2254 in the United States

District Court for the Northern District of Oklahoma. The district court denied

relief. Defendant sought from this court a certificate of appealability (COA),

which we granted, thereby providing jurisdiction to hear this appeal. *See*

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

28 U.S.C. § 2253(c)(1)(A) (requiring a COA to appeal denial of relief under section 2254).

On appeal Defendant raises the following challenges to his conviction: (1) there was insufficient evidence to support his conviction; (2) the prosecutor's alleged misstatement of the evidence during closing argument denied him his due-process right to a fair trial; and (3) he was denied effective assistance of trial counsel because his counsel (a) failed to present evidence that Defendant's ten-year-old son Geoffrey was responsible for the victim's injuries and (b) failed to call Defendant as a witness in his own defense. The OCCA rejected all these challenges on Defendant's direct appeal from his conviction. Affording the OCCA's decision the deference it is due under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), *see id.* § 2254(d), (e), we affirm the district court's denial of relief.

## I.  BACKGROUND

Defendant and his ten-year-old son Geoffrey lived with his girlfriend Deanna Sanders and her sons, two-year-old Michael Franklin and six-year-old Nathan Sanders. On June 6, 1998, Sanders left the three children in Defendant's care while she went to work. Michael looked healthy at the time. A few hours later Sanders received a page from Defendant asking her to come home because something was wrong with Michael. Upon her return, Sanders found Michael pale, unresponsive, and barely breathing. She told Defendant to call 911. An

ambulance arrived and Sanders told the paramedic that Michael had fallen and hit his head on the curb, the same account that Defendant had given the 911 dispatcher. When the paramedic voiced skepticism, she said that other children had told her that Michael may have imbibed alcohol. Michael was taken to the hospital and treated for a life-threatening brain injury. He survived, but is permanently disabled. A doctor who treated him concluded that he had suffered from a severe blow to the head, the force of which was comparable to that from a high-impact car crash.

Tulsa Police Officer Philip Forbrich interviewed Defendant and Sanders together at the hospital that afternoon. Both signed waivers giving permission to search their house, and Forbrich obtained a signed statement from Defendant providing his version of what had happened. Tulsa Police Sergeant Gary Stansill and Department of Human Services (DHS) investigator David Collins then interviewed Defendant at the hospital; and later that night Defendant was interviewed by officers at the Tulsa police station. The interviews began about 5:20 p.m. and ended about 1:00 a.m. The police also interviewed Sanders separately at the hospital at about 7:00 p.m.

Defendant was charged with child abuse, convicted, and sentenced to life imprisonment. On his direct appeal to the OCCA, he obtained an order for an evidentiary hearing on his claim that trial counsel was ineffective for failure to use available evidence of Geoffrey's culpability. The hearing judge concluded

-3-

that Defendant was not denied effective assistance of counsel and the OCCA, concurring with that conclusion and denying Defendant's other claims, affirmed the conviction and sentence. Defendant did not seek postconviction relief in state court, but filed an application for habeas relief under 28 U.S.C. § 2254 in federal district court. He now appeals the district court's denial of relief.

## II. DISCUSSION

### A. Standard of Review

AEDPA provides that when a claim has been adjudicated on the merits in a state court, a federal court can grant habeas relief only if the applicant establishes that the state-court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). As we have explained:

> Under the "contrary to" clause, we grant relief only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts.

*Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (brackets and internal quotation marks omitted). Relief is provided under the "unreasonable application" clause only if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that

principle to the facts of the prisoner's case. *Id.* (internal quotation marks omitted). Thus, a federal court may not issue a habeas writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. *See id.* Rather, that application must have been unreasonable. The federal court also must presume that the state court's fact-finding was correct; the applicant has the burden to rebut that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

## B. Sufficiency of the Evidence

Defendant was convicted of child abuse. Under Oklahoma law the elements of child abuse are (1) willfully or maliciously (2) injuring or using unreasonable force upon (3) a child under 18. Okla. Stat. tit. 10, § 7115 (Supp. 1996). Evidence is sufficient to sustain a conviction if, "'after viewing [it] in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Dockins v. Hines*, 374 F.3d 935, 939 (10th Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Therefore, under AEDPA our task is to determine "whether the OCCA's conclusion that the evidence was sufficient constituted an unreasonable application of the *Jackson* standard." *Diestel v. Hines*, 506 F.3d 1249, 1267 (10th Cir. 2007) (internal quotation marks omitted). On Defendant's appeal the OCCA held that "the evidence, viewed in a light most favorable to the State, was

-5-

sufficient to exclude every reasonable hypothesis except that of guilt." Aplt. App. at 79. Because the sufficiency-of-evidence standard applied by the OCCA is at least as strict as that in *Jackson*, we review its decision with AEDPA deference. *See Patton v. Mullin*, 425 F.3d 788, 795 (10th Cir. 2005) (we grant AEDPA deference to state-court decisions that applied a legal standard either identical to the federal standard or more favorable to the habeas applicant than the federal standard).

The issue at trial was what happened to Michael while Sanders, his mother, was at work. Defendant was the children's sole caretaker at the time, yet he did not call 911 until Sanders returned home and asked him to do so. Neither he nor any of the children testified at trial. But before trial Defendant gave several statements regarding the pertinent events. In the interest of clarity, we begin with a chronological account of Defendant's statements after the 911 call. We then summarize the other trial evidence concerning Geoffrey before discussing the expert medical testimony presented by the parties.

Officer Forbrich testified regarding what Defendant told him in the hospital on the day that Michael was injured. Defendant and Sanders, who were together at the time, said that Michael had possibly fallen and hit his head. Defendant signed a statement explaining:

> I was mowing the lawn and doing yardwork. The children were playing around the driveway. When I finished I asked [Michael,] who was by the garage door[,] if he would like a drink. He shook his

head yes and we walked into the house. I fixed him a drink and he drank it. He wanted more and I fixed another one. He took it and drank some but was lethargic. He then acted like he was going to sleep. I tried to wake him and he acted very tired. I laid him on the bed and turned the fan on him. He was totally asleep and wouldn't come to. I called his mom and she came home. She said call the ambulance [and] I did.

I am not sure if Nathan told me before or after I called [Sanders], but he says [Michael] fell and hit his head on the culvert by the house.

Supp. R., Vol. 1 at 128.

Collins, the DHS investigator, testified regarding the interview that he and Stansill, the police sergeant, had conducted with Defendant that day at the hospital. The interview, which began at 5:20 p.m., lasted over an hour. Collins said that before the interview, Defendant knew that Collins was there to investigate child abuse. Defendant told Collins and Stansill that the three children had played in the yard while he mowed the lawn and were never out of his sight for more than two minutes. He said that he called Sanders after noticing that Michael looked pale and lethargic. Defendant mentioned that Geoffrey was violent and aggressive. He said that Geoffrey had killed animals and was abusive to other children, and that the previous night Geoffrey had pushed his cousin into a fireplace, causing a concussion that required a visit to the emergency room. Defendant added that Geoffrey had been treated for abusive behavior in the past and was scheduled for additional in-patient treatment in two days. Nevertheless, Defendant said that Geoffrey could not have hurt Michael.

Stansill, who was called as a witness by Defendant, testified about Defendant's statements regarding Geoffrey when he was questioned at the police station on the night of the episode by Stansill and two or three other police officers (but not Collins). According to Stansill, Defendant was reluctant to discuss the possibility that Geoffrey could have injured Michael. In fact, Stansill thought that a detective may have been the first to mention Geoffrey (although Collins said that in his interview with Defendant, Defendant had not been prompted before describing Geoffrey as violent). Near the end of the interview, however, Defendant acknowledged that Geoffrey may have injured Michael, and he said that earlier in the day he had seen Geoffrey swinging a metal rod (a rebar) in Michael's presence, an event Defendant had not previously mentioned. Defendant stated that he had taken rebar away and put it in the garage. About 1:00 a.m., Stansill, Defendant, and a detective went to Defendant's house and retrieved the rebar.

Sanders testified that when Defendant returned from the police station, he told her that he had seen Geoffrey swinging a rebar. (Before the police interview, Defendant had told her only that Michael had fallen in the yard, taken a drink, and become sleepy.) Finally, Collins testified that his investigation found that two days after Michael's injury, Defendant had checked Geoffrey into a psychiatric clinic and told the clinic that Geoffrey had severely injured a two-year-old boy.

At trial the defense elicited evidence corroborating Defendant's pretrial statements concerning Geoffrey's violent tendencies. Collins testified that his examination of Geoffrey's school records and interview with Geoffrey's case manager convinced him that Defendant had not been lying when he said that Geoffrey was violent. He further testified that Geoffrey had told him that he, Geoffrey, was the one who had injured Michael (though Collins expressed skepticism because he "[did not] think [Geoffrey] knows what he says most of the time," *id.*, Vol. 2, Part 2 at 312). Also, the defense introduced a two-page assessment of Geoffrey conducted by The Brown Schools at Shadow Mountain (the Brown Schools Assessment). It was dated August 5, 1998, two months after Michael's injury. The assessment described Geoffrey as violent and suffering from delusions, noting that Geoffrey had kicked and head-butted staff members at a shelter, and that he "[a]dmits to physical abuse to sibling—caused brain damage" because the "[two-year-old] wanted to be hurt." *Id.*, Vol. 1 at 131–32. The assessment stated that Geoffrey presented an immediate potential danger to himself and others.

The state's case was founded largely on medical evidence suggesting that Geoffrey could not have caused Michael's injuries (leaving Defendant as the only potential culprit) and that Defendant's description of events was inconsistent with Michael's brain injury. Dr. Phillip Barton, who examined Michael in the emergency room, testified that it "takes a tremendous amount of force to cause" a

skull fracture like Michael's. *Id.*, Vol. 2, Part 1 at 43. In his opinion Michael's subdural hematoma was an injury that requires application of great force. For it to have been caused by a fall, Dr. Barton explained, the drop had to have been about 40 to 50 feet, so Michael could not have just fallen into a culvert (as Defendant had described). Dr. Robert Block, who also examined Michael at the hospital, testified that given the gravity of his injuries, Michael would have been rendered "immediately unconscious" by the impact, *id.* at 194, and thus could not have drunk anything afterwards.

Both doctors further testified that being hit by a rebar—or any other object denser than Michael's skull—would have left markings such as lacerations. No such injuries were found on Michael. According to Dr. Block, Michael's injuries indicated an impact with a flat surface.

The defense rebuttal of this medical testimony was limited. The defense medical expert, a certified forensic pathologist, testified that Michael's injury "could have rendered him unconscious very quickly," *id.*, Part 2 at 379, but that Michael also could have remained conscious for some time after the impact. He said that Defendant's description of Michael's being drowsy and asking for a drink was "entirely consistent" with clinical findings. *Id.* at 387–88. He acknowledged, however, that a rebar would probably have left a visible pattern injury.

Viewing the evidence in the light most favorable to the prosecution, we hold that the OCCA reasonably decided that a rational jury could find Defendant guilty beyond a reasonable doubt. Defendant was Michael's sole caretaker when the child was injured. The brain injury was probably caused by a very severe blow—a blow unlikely to be inflicted by a ten-year-old. Defendant's explanation of how Michael may have been injured was contrary to medical evidence. And medical experts testified that the child's injury was inconsistent with Defendant's account of Michael's having a drink and being lethargic. Under AEDPA, we cannot disturb the OCCA's decision.

## C. Prosecutorial Misconduct

Defendant complains that he was denied his due-process right to a fair trial by a comment in the state's closing argument that misstated the evidence. The comment occurred when the prosecutor was describing the weaknesses of the defense theory that Geoffrey was the one who had caused Michael's injury. The defense had offered into evidence the Brown Schools Assessment conducted two months after Michael's injury. The assessment stated that Geoffrey had admitted to "physical abuse to sibling—caused brain damage." *Id.*, Vol. 1 at 131. The prosecutor noted that Dr. Block had testified that the quoted language came from the person preparing the assessment, not Geoffrey. She pointed out that Defendant had told Sanders about Geoffrey after the police interview, and that when he placed Geoffrey in a psychiatric facility, he said that Geoffrey had hurt

Michael. The prosecutor then suggested that Defendant had tried to convince

Geoffrey to take the blame, observing that "maybe it's possible for [Geoffrey] to

be convinced by his own father that he had something to do with the injury to

Michael." *Id.*, Vol. 2 at 494. This suggestion was improper, Defendant contends,

because the prosecutor knew that Defendant had no contact with Geoffrey in the

month following Michael's injury.

Defendant raised this issue on appeal to the OCCA. The OCCA decision

on the point was terse: "We find . . . that the alleged statement did not amount to

prosecutorial misconduct. *Price v. State*[, 518 P.2d 1281 (Okla. Crim. App.

1974)]." Aplt. App. at 79. *Price* states the following with regard to final

argument:

> [W]e have thoroughly reviewed the closing argument of the
> prosecutor and are of the opinion that the complained of argument
> was reasonable argument of the evidence introduced in this case. . . .
> The right of argument contemplates a liberal freedom of speech, and
> the range of discussion, illustration, and argumentation is wide.
> Counsel for both the State and defendant have a right to discuss fully
> from their standpoint the evidence, and the inferences and deductions
> arising therefrom.

518 P.2d at 1283 (internal quotation marks omitted).

As a preliminary matter, Defendant argues that in rejecting his claim, the

OCCA did not address federal constitutional law and that therefore federal review

of his due-process claim should be de novo. We disagree. Even though a state-

court decision cites no federal law, it is accorded AEDPA deference if the state

-12-

court rejected the claim under a standard either identical to the federal standard or more favorable to the applicant than the federal standard. *See Patton*, 425 F.3d at 795. A prosecutor's comments deny the defendant due process under the federal constitution only if they deprive him of a fair trial. *See Duvall v. Reynolds*, 129 F.3d 768, 794 (10th Cir. 1998). In evaluating such a due-process challenge to a prosecutor's comment, *Duvall* said: "The prosecutor is allowed a reasonable amount of latitude in drawing inferences from the evidence during closing summations" and such comments do not make the trial fundamentally unfair. *Id.* at 795 (internal quotation marks omitted). This approach mirrors that in *Price*. We discern no difference between the state-law test applied by the OCCA and the constitutional due-process standard in *Duvall*, and therefore grant AEDPA deference to the OCCA resolution of the claim of prosecutorial misconduct.

Accordingly, the issue before us is whether the OCCA could reasonably determine that the prosecutor's statement was a fair comment on the evidence. We think it could. Defendant argues that the prosecutor knew that Defendant had no contact with Geoffrey during the month following Michael's injury. But there was trial testimony that a few days after the incident, Defendant put his son in a psychiatric facility, telling the facility that Geoffrey had injured a two-year-old. There was certainly motive and opportunity at that time for Defendant to tell Geoffrey that he was responsible for Michael's injury. We therefore must deny relief on this issue.

-13-

**D.      Ineffective Assistance of Counsel**

Defendant contends that his trial counsel, Larry Oliver, was ineffective in two respects:[1]  (1) failure to present at trial the evidence in his possession that Geoffrey had violent propensities and (2) failure to have Defendant testify.  A party claiming ineffective assistance "must establish (1) that his 'counsel's representation fell below an objective standard of reasonableness,' and (2) that there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *DeLozier v. Sirmons*, 531 F.3d 1306, 1320 (10th Cir. 2008) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)).  "[W]e 'indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'"  *Id.* (quoting *Strickland*, 466 U.S. at 689).

The OCCA rejected Defendant's ineffectiveness claims on the merits. Because such claims are mixed questions of law and fact, *United States v. Orange*, 447 F.3d 792, 796 (10th Cir. 2006), to obtain habeas relief Defendant

---

[1] In his brief in this court Defendant also complained that Oliver was ineffective because he did not wear his hearing aid during trial and could not hear what was happening in the courtroom.  At oral argument, however, defense counsel conceded that he cannot sustain his burden on appeal on this ground. Accordingly, we need not address it.

-14-

must show that the OCCA unreasonably applied the law or determined the facts. He makes no such showing.

### 1.    Failure to Use Evidence

Defendant challenges Oliver's failure to use at trial the available evidence of Geoffrey's violent propensities. He alleges that counsel should have called witnesses to testify and presented documents, such as psychiatric records, detailing Geoffrey's violent behavior. According to Defendant, Oliver essentially used none of this evidence. Only "bits and pieces were tossed out during cross-examination of a state's witness, almost always accompanied by hearsay objections from the prosecution." Aplt. Br. at 24. Had the jury heard the omitted evidence, Defendant contends, he would have been acquitted.

On direct appeal to the OCCA, Defendant raised this ineffectiveness claim and sought an evidentiary hearing to determine whether trial counsel failed to use available evidence that Geoffrey had been the one who injured Michael. The OCCA granted the hearing. Defendant called the only witness at the hearing, Shirley Wilson, who had been Oliver's cocounsel at Defendant's trial.

Wilson testified that a variety of documents describing Geoffrey's psychiatric history and behavioral problems should have been introduced at trial. These documents included school records of Geoffrey's suspensions for aggressive behavior from 1994 to 1998; three sets of records, dated 1998, from The Brown Schools at Shadow Mountain regarding Geoffrey's behavior,

diagnosis, medication, and treatment; five sets of records from Laureate Psychiatric Clinic, dated between 1996 and 1998, detailing Geoffrey's behavior, diagnosis, medication, and treatment; and DHS records from 1998 regarding Geoffrey. She also said that the defense had subpoenaed several of Geoffrey's relatives and teachers to testify to his behavior, such as killing puppies and getting suspended from school for aggression, but that they were not called to testify.

On cross-examination by the state, however, Wilson admitted that Oliver had presented various evidence of Geoffrey's violent propensities. This included evidence of specific instances of aggression, such as killing animals and shoving another child into a fireplace. She acknowledged that Collins, the DHS investigator, testified that during his investigation he had examined Geoffrey's school reports and determined that Geoffrey was violent. Aplt. App. at 213. She also acknowledged that Oliver introduced into evidence the rebar that Geoffrey allegedly used on Michael and that Collins testified that Geoffrey had admitted to causing Michael's head injury. In addition, the state elicited that Oliver had introduced into evidence the Brown Schools Assessment, which stated that Geoffrey had admitted to causing brain damage to Michael and had explained that the two-year-old had wanted to be hurt. The assessment also reported that Geoffrey had been treated multiple times at Laureate Psychiatric Clinic. Wilson conceded that the defense team had thought that presenting all the documents that

it had gathered would have been overkill and had been concerned about "the evidence being cumulative." *Id.* at 207.

The hearing judge concluded that Oliver's alleged failure to use certain evidence was not deficient. She explained:

> Any failure to use certain documents during the course of the trial was legitimate trial strategy premised upon any number of considerations including, but not limited to, the documents being cumulative of other evidence introduced, the documents not being relevant to the issues at trial, and/or the information contained in the documents being otherwise available.

*Id.* at 91. The judge ruled that Defendant was not deprived of his constitutional right to counsel. *Id.*

The OCCA, affirming the hearing judge's evidentiary findings and conclusions, held that the "alleged instances of ineffective assistance of counsel were strategic decisions." *Id.* at 79. Because the OCCA's decision was clearly reasonable, we reject this claim of ineffective assistance.

### 2. Failure to Have Defendant Testify

Defendant also complains in this court that Oliver was ineffective because he "did not have Mr. Epperson testify." Aplt. Br. at 29. He had raised an identical claim before the OCCA, but did not seek an evidentiary hearing on the issue. In rejecting Defendant's ineffectiveness claim, the OCCA did not distinguish the failure to call Defendant as a witness from the failure to use evidence of Geoffrey's violent propensities. It said merely, "[T]he alleged

-17-

instances of ineffective assistance of counsel were strategic decisions, which we will not second-guess on appeal." Aplt. App. at 79.

The OCCA's rejection of this claim was reasonable. Defendant indicates that had he testified, he would have denied injuring Michael and described Geoffrey's violent disposition. But Oliver had already presented the jury with substantial evidence of Defendant's prior denials and of Geoffrey's psychiatric problems. He could have reasonably decided that Defendant's testimony would add nothing new. Moreover, there were dangers in Defendant's testifying. The Brown Schools Assessment of Geoffrey contains a note that Defendant was verbally and physically abusive to Geoffrey. Counsel therefore had cause to fear that any accusatory mention of Geoffrey by Defendant would open him up to cross-examination on this subject. Under these circumstances, the OCCA could reasonably decide that counsel's decision not to have Defendant testify was objectively reasonable.

At oral argument before this court, Defendant suggested a somewhat different claim based on his failure to testify. He contended that counsel prevented him from testifying. We do not analyze such a contention as we do tactical or strategic decisions by counsel. "A criminal defendant has a constitutional right to testify in his own behalf at trial." *Cannon v. Mullin*, 383 F.3d 1152, 1171 (10th Cir. 2004). Therefore "[t]he decision whether to testify lies squarely with the defendant; it is not counsel's decision." *Id.* No matter how

unwise it may be for a defendant to testify, it is ineffective assistance of counsel to prevent the defendant from exercising his right to do so. *See id.*

But this claim is not properly before us. Defendant did not raise it in his briefs in this court. Nor has he provided a factual basis for the claim. To establish an ineffectiveness claim predicated on violation of the right to testify, a habeas applicant must show that he did not know that he had a right to testify and would have wanted to, or that he requested to testify and that counsel refused his request. *See id.* at 1170–71 (habeas petitioner's affidavit alleged that counsel refused petitioner's multiple requests to testify); *cf. United States v. Meacham*, 567 F.3d 1184, 1188 (10th Cir. 2009) (upholding denial of defendant's motion for a new trial because the motion "does not claim that Mr. Meacham was unaware of his constitutional right to testify at trial" and that to obtain an evidentiary hearing, "a defendant must assert more than the bare conclusion that counsel 'refused to let' the defendant testify."). At oral argument defense counsel stated that either his client or Wilson had described in an affidavit Defendant's desire to testify. But the record contains no such affidavit. We therefore reject this claim.

## III.   CONCLUSION

We AFFIRM the district court's denial of habeas relief.

ENTERED FOR THE COURT

Harris L Hartz
Circuit Judge

-19-